Filed 4/29/21  Barto/Signal Petroleum, Inc. v. Boneyard, LLC CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| BARTO/SIGNAL PETROLEUM, INC., | B299794 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. NC061431) |
| v. | |
| BONEYARD, LLC et al., | |
| Defendants and Appellants. | |

APPEALS from a judgment and postjudgment order of the Superior Court of Los Angeles County.  Maurice A. Leiter and Gary Y. Tanaka, Judges.  Affirmed.

Schilling Law Group, Linda Schilling, Charity M. Gilbreth and Tyler H. Hunt for Plaintiff and Appellant.

Enterprise Counsel Group, Holland & Knight, David A. Robinson and Thomas J. Eastmond for Defendants and Appellants.

\* \* \* \* \* \* \* \* \* \*

Plaintiff and appellant Barto/Signal Petroleum, Inc., appeals from the trial court's entry of judgment in favor of Defendants and appellants Boneyard, LLC, Brawley-Memphis, LLC and Geoffrey Le Plastrier. The court found three of plaintiff's four causes of action, for breach of contract, specific performance and fraud, were barred by the statutes of limitations, and the fraud cause of action failed to state a claim. The court denied summary adjudication of plaintiff's declaratory relief cause of action, after which the parties resolved that claim by way of a stipulation that was incorporated into the final judgment.

Defendants cross-appeal from the trial court's postjudgment order awarding them $410,115.50 in attorney fees, which reduced their fee request by over $250,000. Defendants contend the court, a different judge than the judge who ruled on the summary judgment motion, abused its discretion in reducing their fee award in violation of applicable law governing contractual fee awards.

We conclude the trial court properly granted judgment in favor of defendants, and defendants have failed to demonstrate the trial court abused its discretion in calculating a reasonable fee award. We therefore affirm both the judgment and the postjudgment order.

**FACTUAL AND PROCEDURAL BACKGROUND**

This contract dispute concerns real property in the Signal Hill neighborhood of Long Beach known as the Boneyard Property. The facts summarized in this background discussion are undisputed.

In the 1990's, the Boneyard Property was owned by Alamitos Land Company. It consisted of 106 lots, 85 planned for residential development (the Residential Lots) and 21 designated for oil-producing operations (the Oil Lots). The Oil Lots were interspersed among the Residential Lots.

2

The Boneyard Property is located within an active oil field called the Signal Hill East Unit, operated by plaintiff Barto/Signal Petroleum, Inc. Alamitos Land Company held working and royalty interests in the Signal Hill East oil field. A dispute arose between plaintiff and Alamitos Land Company that resulted in the filing of a quiet title action. The terms of the settlement of the quiet title action are the subject of this lawsuit.

The quiet title action was settled in November 1999. Plaintiff and Alamitos Land Company executed a written settlement agreement (the Settlement Agreement), as well as a second agreement called the Surface Use Relinquish Agreement and Grant of Easement (the SURGE Agreement).

In the Settlement Agreement, defendants promised to convey the 21 Oil Lots in the Boneyard Property to plaintiff after defendants completed development of the 85 Residential Lots and closed escrow on the sale of 95 percent of the Residential Lots to third parties. The SURGE Agreement granted easements to plaintiff over portions of the Boneyard Property for use in its oil operations. The SURGE Agreement, and subsequent amendments not relevant here, were recorded in the chain of title.

Sometime in 2002, title to the Boneyard Property was transferred to Alamitos Ridge, LLC, and then to defendant Boneyard, LLC several years later. Under the terms of the Settlement Agreement, the successor owners of the Boneyard Property assumed the obligations originally owed to plaintiff by Alamitos Land Company.

Development proceeded, beginning with "horizontal improvements" such as grading, roads, utilities and water lines, as well as improvements to the Oil Lots and relocation of some oil facility infrastructure to accommodate both the development of the

3

Residential Lots and plaintiff's ongoing oil operations. The Settlement Agreement expressly required defendants to coordinate their development activities with plaintiff to minimize disruption of plaintiff's oil operations. The Settlement Agreement included provisions requiring plaintiff's knowledge and signature on certain plans and permits, and reimbursement to plaintiff if development activities interrupted plaintiff's operations. (E.g., paragraph 3.4.1 "Interference with Oil Operations," paragraph 3.4.3 "Relocation of Oil Facilities," paragraph 3.5.1.1 "Compensation for Loss of Oil Production," paragraph 3.6 "Development Cooperation." (Italics omitted.))

In late 2009, defendant Boneyard filed a Chapter 11 bankruptcy petition. During the bankruptcy proceedings, Boneyard obtained court approval to sell the Residential Lots to Lennar Homes. Plaintiff filed an objection to the sale but ultimately withdrew its objection and allowed finalization of the sale. Sale of the 85 Residential Lots to Lennar Homes was completed in February 2010, when development was about 80 percent complete. Boneyard emerged from bankruptcy still holding title to the 21 Oil Lots.

Development of the Residential Lots was completed by September 2012, and all the Residential Lots had been sold to third parties by then. But defendants took no steps to convey the Oil Lots to plaintiff despite its promise to do so in the Settlement Agreement.

Meanwhile, in late 2010, Boneyard stopped paying property taxes on the Oil Lots. Consequently, in 2016, all 21 Oil Lots were sold by the Los Angeles County Office of the Assessor in a tax sale. Defendant Brawley-Memphis, one of defendant Geoffrey Le Plastrier's business entities, purchased six of the Oil Lots, and the remaining 15 lots were purchased by third parties. Plaintiff was

able to purchase five of the lots sold to third parties. Plaintiff made a demand on Boneyard for transfer of the six lots purchased by Brawley-Memphis but was refused. Plaintiff filed this action on October 13, 2017.

**1. Paragraph 3.4.5 of the Settlement Agreement**

We quote below key provisions in paragraph 3.4.5, titled "Transfer of the Oil Lots," that are pertinent to our analysis.

"Provided that Signal performs all of its material obligations pursuant to this Settlement Agreement and the Exhibits hereto, Alamitos and/or its successors shall convey to Signal, by grant deed, the Oil Lots, at such time as Alamitos, and/or its successors, has completed all development with respect to the Boneyard lots (including without limitation the entitlements, subdivision and improvement) and sold and closed escrow on ninety-five percent (95%) or more of the subdivided lots and property within the Boneyard (other than the Oil Lots) to an unaffiliated third party. . . . [With exceptions specifically identified in provisions we omit from this opinion for the sake of brevity], the grant shall be on an 'As-Is' and 'With-All Faults' basis, with no representation or warranty of any kind and subject to all encumbrances, taxes, pro-rata share of assessments, and matters of record; provided that such Oil Lots shall not be encumbered with any monetary deed of trust, mortgage or mechanics liens at the time of the grant, and all delinquent real estate taxes and assessments shall have been paid. . . . As consideration for Alamitos' performance of all conditions of conveyance to Signal, which shall be deemed performed by Signal's receipt and recordation of the grant deed, for each Oil Lot deeded to Signal, Signal shall concurrently execute in favor of Alamitos a Promissory Note in the form of Exhibit 'N' attached hereto, each in the amount of $30,000, each of which shall be secured by a

5

concurrently recorded first priority Deed of Trust in the form of Exhibit 'O' attached hereto encumbering the respective Oil Lot.  Any Alamitos successors as owner of the Boneyard, other than a home builder or homeowner, must specifically assume the obligations in this [paragraph] 3.4.5; however, such assumption shall not relieve Alamitos of such obligations.  Moreover, Alamitos agrees that, following recordation of the final subdivision map for the Boneyard, Alamitos shall not sell or transfer the Oil Lots to any party other than Signal as provided in this [paragraph] 3.4.5."

**2.     The Complaint**

On October 13, 2017, plaintiff filed this action against Alamitos Land Company, Alamitos Ridge, LLC, Boneyard, LLC, Brawley-Memphis, LLC and Geoffrey Le Plastrier alleging four causes of action:  (1) breach of contract; (2) specific performance; (3) declaratory relief; and (4) fraudulent concealment.

The contract cause of action alleged defendants breached paragraph 3.4.5 of the Settlement Agreement (quoted above) in December 2016 by allowing the Oil Lots to be sold to third parties at a tax sale.  Plaintiff did not allege any breach arising from the failure to convey title following completion of development of the Residential Lots in September 2012.  Plaintiff alleged it first learned of the tax sale and the purchase by Brawley-Memphis of six of the Oil Lots in April 2017.  Plaintiff demanded transfer of title as to those six lots.  Defendants refused.  Plaintiff alleged it was able to purchase five of the Oil Lots from the third parties that acquired them at the tax sale.  Plaintiff sought damages for having to purchase the lots to which it was entitled under the Settlement Agreement and the loss of its right to acquire all 21 Oil Lots.

The second cause of action for specific performance sought an order compelling transfer of the six Oil Lots still owned and

controlled by the "Boneyard Defendants." The third cause of action for declaratory relief alleged there was a dispute between the parties regarding the alleged control by the "Boneyard Defendants" over the six Oil Lots purchased by defendant Brawley-Memphis and also requested a declaration as to the continuing validity of plaintiff's easements granted under the SURGE Agreement.

The fourth cause of action for fraudulent concealment alleged defendants owed plaintiff a duty to disclose "any event or circumstance" that would prevent them from conveying the Oil Lots to plaintiff as required by the Settlement Agreement, and defendants concealed their scheme to not pay property taxes so they could force a tax sale and avoid their obligation to transfer the Oil Lots to plaintiff.

### 3. The Summary Judgment Motion

Defendants' motion for summary judgment was based primarily on the defense of the statute of limitations. Defendants argued the four-year statute of limitations for actions founded on a written instrument (Code Civ. Proc., § 337, subd. (a)) applied to the first, second and third causes of action, and the three-year statute applied to the fraud cause of action (§ 338, subd. (d)). Plaintiff does not dispute these are the applicable statutes of limitations.

Defendants argued all of plaintiff's claims accrued in September 2012, more than five years before this action was filed, when the development conditions under paragraph 3.4.5 of the Settlement Agreement were satisfied. Plaintiffs disputed their claims accrued in 2012.

Defendants also argued the fraud cause of action failed to state a claim because the tax status of the Oil Lots was a matter of public record, and the Settlement Agreement did not impose any duty of disclosure regarding the tax status of the property.

7

Defendants also contended the fraud claim was legally deficient since it did not allege the breach of an independent tort duty but only a duty arising from contract.

Defendants presented as evidence the deeds transferring all 85 Residential Lots to third parties that were recorded by September 2012, the certificates of occupancy for all properties, and the recorded copy of the subdivision tract map for the Boneyard Property. Defendant also relied on plaintiff's responses to written discovery in which plaintiff initially admitted the development conditions identified in paragraph 3.4.5 were completed no later than October 12, 2013 (four years one day before this action was filed), and later admitted those conditions were completed by September 2012 (over five years before this action was filed).

Defendant submitted the declaration of Frawn Morgan, the manager of defendant Boneyard, attesting to the undisputed facts described above. Ms. Morgan also described a conversation she had in October 2010 with David Slater, the chief operating officer of Signal Hill Petroleum which managed plaintiff. She said Mr. Slater had sent her an email inquiring about the status of the transfer of the Oil Lots. They arranged to speak by phone. Ms. Morgan said she told Mr. Slater the development conditions were nearly satisfied, and she broached the subject of a transfer of the Oil Lots to plaintiff. She proposed the parties share pro rata the property taxes that were due in six-month installments, based on an expected date of transfer. Mr. Slater declined the offer. Ms. Morgan was not aware plaintiff made any further inquiries about transfer of the Oil Lots until April 2017. Plaintiff disputed this conversation took place.

**4.      Plaintiff's Opposition to the Motion**

Plaintiff admitted most of defendants' material facts were undisputed, including that the development of the Residential Lots

was completed no later than September 2012, and all deeds documenting the sales of those lots to third parties were recorded in the office of the Los Angeles County Registrar-Recorder/County Clerk by then. Plaintiff admitted its oil producing operations were located, in part, on the Oil Lots and that representatives of plaintiff were at the Boneyard Property "on a daily basis" to conduct oil operations since at least 2009.

Plaintiff argued these undisputed facts were irrelevant because it alleged the breach of contract occurred in 2016 when defendants lost title to the Oil Lots in the tax sale in violation of the last sentence of paragraph 3.4.5 ("Alamitos shall not sell or transfer the Oil Lots to any party other than [plaintiff]"). Plaintiff also argued defendants were not obligated to transfer title to the Oil Lots in 2012 because they had not satisfied all the preconditions imposed by the Settlement Agreement. Plaintiff said paragraph 3.4.5 required defendants to provide clear title to the Oil Lots, and in 2012, they remained burdened with a lien by Pacific Western Bank and unpaid taxes.

Plaintiff presented the deposition testimony of Ms. Morgan and defendant Geoffrey Le Plastrier in which both admitted that, in 2012, title to the Oil Lots was clouded by delinquent property taxes and the lien by Pacific Western Bank. Ms. Morgan and Mr. Le Plastrier also admitted in their depositions that Boneyard stopped paying taxes on the Oil Lots in late 2011 because it no longer had any beneficial interest in the properties. Mr. Le Plastrier testified Boneyard stopped paying the property taxes on the Oil Lots because it did not have a significant income stream, had no beneficial interest in the Oil Lots, and plaintiff had not shown any interest in a transfer of title.

9

Plaintiff also submitted the declaration of Mr. Slater disputing that he ever had the conversation described in Ms. Morgan's declaration regarding a proposed tender of the Oil Lots. He also said plaintiff had no knowledge of the delinquent tax status until April 2017.

In support of its fraud claim, plaintiff relied primarily on the deposition testimony of Ms. Morgan and Mr. Le Plastrier that defendants had not notified plaintiff of the tax status of the Oil Lots.

**5.    The Trial Court's Order and Judgment**

The trial court's tentative was to grant defendants' motion as to the breach of contract, specific performance and fraud causes of action and deny it as to the third cause of action for declaratory relief. The court indicated its intent to deny adjudication of the declaratory relief claim because the motion failed to address that portion of the claim seeking a declaration acknowledging the continuing validity of plaintiff's easements in the Oil Lots pursuant to the SURGE Agreement. During the hearing on the motion, the court discussed the issue with counsel. The parties ultimately agreed to a stipulation acknowledging plaintiff's continuing easement rights. The court issued its written ruling on the motion and the parties' stipulation as to the declaratory relief claim was incorporated into the final judgment.

Judgment in favor of defendants was entered on July 10, 2019.

**6.    Defendants' Attorney Fees Motion**

Defendants filed a memorandum of costs and a motion for attorney fees pursuant to paragraph 7.16 of the Settlement Agreement. Plaintiff filed a motion to tax costs. The postjudgment motions were not heard by Judge Leiter, who ruled on the summary judgment motion, but by Judge Gary Tanaka.

10

In their fee motion, defendants argued they were the prevailing parties under the contract despite the court having denied summary adjudication of the third cause of action. Defendants submitted redacted billing records documenting the work performed on the case for almost two years. The bills reflected 15 separate timekeepers, including two partners, seven associate attorneys, three paralegals and three law clerks for a total of 1,518.40 hours. The billable rates ranged from $95 to $850 per hour. Additional fees were requested for time spent preparing a reply brief for the fee motion and arguing the postjudgment motions. Defendants requested $666,539.50 in total fees. Defense counsel attested that defendants had paid all the billed fees and costs.

Plaintiff opposed the motion, arguing defendants were not prevailing parties because plaintiff achieved a significant success, namely confirmation that its easement rights under the SURGE Agreement remained valid. Plaintiff also argued the fees requested were excessive and unreasonable. Plaintiff said the billing statements reflected extensive duplication of work, overstaffing, inflated hourly rates and improper block billing.

After lengthy oral argument, the court took the matter under submission. Plaintiff's counsel submitted supplemental papers, including billing records showing, in contrast to the defense, plaintiff's counsel billed for only 839.60 hours of work for total attorney fees of $295,884.50.

Thereafter, the trial court issued its ruling finding defendants were the prevailing parties. In a seven-page ruling, the court explained the bases for its calculation of a reasonable fee of $410,115.50. After taxing $12,050.97 in costs, the court awarded defendants total costs in the amount of $9,009.13.

## 7. The Appeal and Cross-appeal

Plaintiff timely appealed from the trial court's grant of judgment in defendants' favor. Plaintiff argues its claims are not time barred, the fraudulent concealment claim properly sounds in tort, and the fee award must be reversed if this court reverses the judgment.

Defendants cross-appealed from the trial court's order awarding attorney fees, arguing the court abused its discretion in reducing the amount of recoverable fees.

## DISCUSSION

### The Summary Judgment Motion

Summary judgment is appropriate where "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) Since the 1992 and 1993 amendments to the summary judgment statute, our Supreme Court has made clear that the purpose of the amendments was " 'to liberalize the granting of [summary judgment] motions.' " (*Perry v. Bakewell Hawthorne, LLC* (2017) 2 Cal.5th 536, 542; *Aguilar v. Atlantic Richfield Co*. (2001) 25 Cal.4th 826, 848.) Summary judgment is no longer referred to as a "disfavored" remedy. (*Perry*, at p. 542.) "Summary judgment is now seen as a 'particularly suitable means to test the sufficiency' of the plaintiff's or defendant's case." (*Ibid*.)

On appeal, "we take the facts from the record that was before the trial court . . . . ' "We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained." ' " (*Yanowitz v. L'Oreal USA, Inc*. (2005) 36 Cal.4th 1028, 1037, citation omitted.)

12

" 'While resolution of the statute of limitations issue is normally a question of fact, where the uncontradicted facts established through discovery are susceptible of only one legitimate inference, summary judgment is proper.' " (*NBCUniversal Media, LLC v. Superior Court* (2014) 225 Cal.App.4th 1222, 1231 (*NBCUniversal*).)

**1.     The Contract Claims**

A contract cause of action ordinarily "*accrues at the time of breach*, and the statute begins to run at that time regardless whether any damage is apparent or whether the injured party is aware of his or her right to sue." (3 Witkin, Cal. Procedure, 5th Actions § 520 (2020), italics added; *Romano v. Rockwell International, Inc*. (1996) 14 Cal.4th 479, 488 [contract cause of action accrues at time of breach].)

Plaintiff argues it never pled a 2012 breach and framed its complaint as arising from the alleged breach in 2016 when the Oil Lots were sold at a tax sale due to the property tax delinquencies. Plaintiff argues it could not sue until it could prove damages, and it did not suffer damages until 2016 because it continued to have beneficial use of the Oil Lots pursuant to its easement rights. We agree with the trial court that plaintiff's causes of action arose in 2012 when defendants became obligated to transfer the Oil Lots to plaintiff but did not do so.

" 'Ordinarily, the objective intent of the contracting parties is a legal question determined solely by reference to the contract's terms.' " (*Wind Dancer Production Group v. Walt Disney Pictures* (2017) 10 Cal.App.5th 56, 69.) Paragraph 3.4.5 of the parties' agreement provided that defendant Alamitos and its successors "shall convey" the Oil Lots to plaintiff by grant deed when the residential development was completed and escrow had closed on

13

the sale of 95 percent or more of the lots to unaffiliated third parties. Plaintiff admits the development was completed and escrow had closed on the sale of 95 percent of the lots to third parties by September 2012.  Under the contract, defendants were required to transfer title to the Oil Lots by September 2012.  Plaintiff suffered a legally cognizable injury when defendants failed to transfer title by September 2012.

Real property is unique.  (*Union Oil Co. of California v. Greka Energy Corp*. (2008) 165 Cal.App.4th 129, 134 [it is presumed " 'that the breach of any agreement to transfer real property cannot be adequately compensated for by money damages' "].)  In recognition of this ancient principle of real property transactions, the Settlement Agreement provided at paragraph 7.19 that each party acknowledged the other party "would suffer irreparable harm by a violation of, or failure to comply with" paragraph 3.4.5 and that such party would be entitled to seek injunctive and other equitable relief.

The failure to transfer title in 2012 was a material breach of the Settlement Agreement giving rise, at a minimum, to a cause of action for specific performance more than five years before plaintiff filed this action.  The fact that plaintiff had ongoing easement rights in the Oil Lots is irrelevant to the accrual analysis.

So too is the fact that title was clouded by a bank lien and unpaid taxes.  Defendants promised to convey the Oil Lots unencumbered by any deed of trust, mortgage or mechanics liens and to pay all delinquent real estate taxes and assessments.  These promises did not create a precondition to plaintiff's right to obtain title to the Oil Lots, nor did breach of these promises delay defendants' duty to convey title.  Defendants' breach of these promises gave plaintiff the right to sue for injunctive relief and

14

damages; it did not give plaintiff the right to wait until defendants lost title to the Oil Lots before bringing suit.

Plaintiff was required to act reasonably and diligently in asserting its right under the Settlement Agreement to obtain title to the Oil Lots. The fact defendants lost title in 2016 and could no longer comply with their obligations under the Settlement Agreement was a consequence of plaintiff failing to timely assert its rights. It is not evidence of a new, discreet injury for which a new cause of action accrued, separate and apart from the 2012 breach.

Plaintiff also asserts the discovery rule tolled the statutes of limitations. The discovery rule "postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 807.) "A plaintiff has reason to discover a cause of action when he or she 'has reason at least to suspect a factual basis for its elements.'" (*Ibid.*)

Most often applied in the tort context, the discovery rule has been applied in contract actions in unusual cases with facts and circumstances not present here. It has been applied to breaches of contract "which can be, and are, committed in secret and, moreover, where the harm flowing from those breaches will not be reasonably discoverable by [the plaintiff] until a future time." (*April Enterprises, Inc. v. KTTV* (1983) 147 Cal.App.3d 805, 832.) "A plaintiff's inability to discover a cause of action may occur 'when it is particularly difficult for the plaintiff to observe or understand the breach of duty, or when the injury itself (or its cause) is hidden or beyond what the ordinary person could be expected to understand.'" (*NBCUniversal, supra,* 225 Cal.App.4th at p. 1232.)

Here, nothing was secret or hidden. Everything happened right out in the open. The Settlement Agreement required

15

defendants to coordinate the development with plaintiff's knowledge and involvement. It was undisputed plaintiff was at the Boneyard Property every day conducting its oil operations during defendants' construction and sales activities. The recorded deeds and subdivision map were matters of public record. No facts or evidence justify application of the discovery rule to delay accrual of plaintiff's contract claims. (*Eleanor Licensing LLC v. Classic Recreations LLC* (2018) 21 Cal.App.5th 599, 611, fn. 10 [no basis for applying delayed discovery rule to contract claim for failure to transfer legal title to classic car where there was "nothing secret or hidden" about the defendant's refusal to transfer title].)

The dispute over whether Mr. Slater had the conversation with Ms. Morgan in late 2010 about the status of the properties and arrangements for a transfer of title is immaterial. Whether or not a tender of title was discussed in 2010, it was undisputed the development conditions required by paragraph 3.4.5 were satisfied no later than September 2012.

2.    **The Fraud Claim**

In addition to the statute of limitations defense, defendants also sought summary adjudication of plaintiff's fraudulent concealment cause of action for failure to state a claim. (*Sequoia Ins. Co. v. Superior Court* (1993) 13 Cal.App.4th 1472, 1481 ["where a complaint is insufficient to state a cause of action, a defendant's motion for summary judgment is in legal effect a motion for judgment on the pleadings, and factual controversies are essentially irrelevant"].) Defendants argued plaintiff failed to allege an independent duty arising in tort and not from the parties' contracts.

Plaintiff's fraud cause of action alleged defendants owed a duty to disclose to plaintiff "any event or circumstance that would prevent the Boneyard Defendants from being able to convey the Oil

16

Lots to Plaintiff as required under the Settlement Agreement" and a "duty not to intentionally jeopardize the obligation to convey the Oil Lots to Plaintiff." Plaintiff alleged defendants intentionally concealed the fact they had allowed the Oil Lots to go into tax default as part of a scheme to retain ownership of at least some of the Oil Lots.

" '[C]onduct amounting to a breach of contract becomes tortious only when it also violates a duty independent of the contract arising from principles of tort law.' " (*Robinson Helicopter Co., Inc. v. Dana Corp.* (2004) 34 Cal.4th 979, 989.) Plaintiff has not alleged or created a material dispute that defendants owed any duty to plaintiff other than to fulfill the contract promises. Plaintiff contends an independent tort duty did exist, citing the principle that "where one party to a transaction has sole knowledge or access to material facts and knows that such facts are not known or reasonably discoverable by the other party, then a duty to disclose exists." (*Shapiro v. Sutherland* (1998) 64 Cal.App.4th 1534, 1544.)

The undisputed facts here do not show defendants had sole knowledge of facts that were unknown to or were not reasonably discoverable by plaintiff. Plaintiff concedes the Settlement Agreement did not impose a duty on defendants to timely pay property taxes and in fact contemplated the possibility of a default on property taxes. Moreover, the tax status of the Oil Lots was a matter of public record. The trial court did not err in finding the fraud claim was defective as a matter of law.

**The Motion for Attorney Fees**

A challenge to the amount of a fee award is reviewed under the deferential abuse of discretion standard. (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095 (*PLCM*).) "An appellate court will interfere with the trial court's determination of the amount of

reasonable attorney fees only where there has been a manifest abuse of discretion. [Citation.] ' "The 'experienced trial judge is the best judge of the value of professional services rendered in [the] court, and while [the judge's] judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong['] "—meaning that [the trial judge] abused [his or her] discretion.' " (*Heritage Pacific Financial, LLC v. Monroy* (2013) 215 Cal.App.4th 972, 1004.)

Initially, defendants point out the fee motion was not heard by Judge Leiter, who ruled on the summary judgment and was in the best position to understand the work that was required to obtain a successful outcome. Although Judge Tanaka did not rule on the summary judgment motion, his ruling on the attorney fees motion is nonetheless entitled to deference. The court read the parties' papers, discussed the issues at length with counsel at oral argument, took the matter under submission and reviewed the billing records at least twice before issuing a ruling.

The court found defendants were the prevailing parties, entitled to a reasonable fee award under paragraph 7.16 of the Settlement Agreement. Paragraph 7.16 of the Settlement Agreement states, in pertinent part, that the losing party in any action arising from the agreement "shall pay to the prevailing party a reasonable sum for attorney fees and costs incurred in bringing or defending such action or proceeding."

" 'The "burden is on the party seeking attorney fees to prove that the fees it seeks are reasonable. [Citation.] It is also [the appellant's] burden on appeal to prove that the court abused its discretion in awarding fees." ' " (*Gonzalez v. Santa Clara County Dept. of Social Services* (2017) 9 Cal.App.5th 162, 169.)

18

Defendants requested $666,539.50 in fees. They submitted billing records spanning almost two years of work on the case by 15 separate timekeepers (two partners, seven associate attorneys, three paralegals and three law clerks)—over 1,500 hours. The billable rates ranged from $95 to $850 per hour. The court found defendants' rates were "on par with those in the community and correlate with the resumes of the respective attorneys."

The trial court performed the basic lodestar calculation based on the billing records and then made a determination to reduce that amount to account for fees the court found to be unreasonable and excessive, as well as a percentage reduction for block billing entries. Making such reductions to arrive at a reasonable fee was well within the trial court's discretion. (*PLCM*, *supra*, 22 Cal.4th at p. 1096 [Once the lodestar is determined, the court " 'shall consider whether the total award so calculated under all of the circumstances of the case is more than a reasonable amount and, if so, shall reduce the [Civil Code] section 1717 award so that it is a reasonable figure.' "]; accord, *EnPalm, LLC v. Teitler* (2008) 162 Cal.App.4th 770, 774–775 [trial court entitled to reduce lodestar to a reasonable figure after concluding "much of the litigation [was] unnecessary" and therefore "most of the lodestar figure represented attorney fees that were unreasonable"].)

The court wrote a lengthy ruling explaining the reasons for its deductions. The court explained that upon its initial review of defendants' billing records, it found "a total of $39,851.50 of charges that represent[ed] excessive collaboration . . . . These entries involved instances such as multiple higher-level attorneys reviewing the same documents or duplicative review of discovery responses. This initial pass was hampered by defense counsel's block billing;

19

the Court was unable to differentiate time spent, for example, on research versus time counsel spent conferring with one another."

The court explained that it then reviewed the billing records a second time "and determined $91,631.50 to have been unnecessary charges related to discovery. The block billed entries were treated separately from the preceding figures. The Court has determined at least $176,830 was block billed included in these billings were excessive time spent on the three depositions, additional written discovery, and interoffice communications. On review of these entries, the Court finds a 65% reduction ($114,939.50) in these bills is appropriate." The court also deducted $10,001.50 in fees related to the second motion for judgment on the pleadings which the court found to be unnecessary and therefore not reasonable.

Defendants argue that block billing is not per se prohibited and that it ordinarily becomes an issue only where the trial court must apportion fees between claims for which fees are properly awarded and those where they are not. Defendants say there is no apportionment required here because all the work is compensable under the terms of the contractual fee provision. Defendants are correct block billing is not prohibited. The trial court did not reduce the fee award because it believed block billing is prohibited. The court reduced the fee award because it concluded defendants did not establish their fee request was reasonable.

"Block billing occurs when 'a block of time [is assigned] to multiple tasks rather than itemizing the time spent on each task.' " (*Mountjoy v. Bank of America, N.A.* (2016) 245 Cal.App.4th 266, 279; see also *Jaramillo v. County of Orange* (2011) 200 Cal.App.4th 811, 830 ["[B]lock billing is not objectionable 'per se,' though it certainly does increase the risk that the trial court, in a reasonable exercise of its discretion, will discount a fee request."].) Prevailing parties "are

20

not automatically entitled to all hours they claim in their request for fees.  They must prove the hours they sought were reasonable and necessary." (*El Escorial Owners' Assn. v. DLC Plastering, Inc.* (2007) 154 Cal.App.4th 1337, 1366.)  Block billing made the court's task much more difficult.

For instance, the trial court found there appeared to be duplicative work and excessive amount of time spent on "collaboration" and "interoffice communications" but that block billing hampered its review and determination of whether that time, or part of it, was reasonable or excessive.  (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132 ["[T]rial courts must carefully review attorney documentation of hours expended; 'padding' in the form of inefficient or duplicative efforts is not subject to compensation."].)  The trial court found the block billing made it impossible in some instances to determine whether time incurred was reasonable.  The court acted within the bounds of its discretion in reducing the fees.  Defendants have not affirmatively shown the fee award of $410,115.50 was an abuse of discretion.

## DISPOSITION

The judgment dated July 10, 2019 in favor of Boneyard, LLC, Brawley-Memphis, LLC and Geoffrey Le Plastrier is affirmed.

The postjudgment order awarding attorney fees to Boneyard, LLC, Brawley-Memphis, LLC and Geoffrey Le Plastrier in the amount of $410,115.50 is affirmed.

The parties shall bear their respective costs of appeal.


GRIMES, Acting P. J.


WE CONCUR:

STRATTON, J.          WILEY, J.


21